Merrimack. }
June 27, 1929. }

ARTHUR J. WATKINS *v.* BOSTON & MAINE RAILROAD.

*Robert W. Upton* and *Joseph C. Donovan* (*Mr. Upton* orally), for the plaintiff.

*Demond, Woodworth, Sulloway & Rogers* (*Mr. Jonathan Piper* orally), for the defendant.

BRANCH, J.  1. Defendant's position in regard to the denial of its motions for a nonsuit and for a directed verdict, "is briefly that (1) the alleged lateral play in the apron would not and could not make the apron more dangerous to ride on or have any tendency to increase the lateral motion of the apron, and (2) that a sudden lurch to the right as testified to by the plaintiff would throw him to the left

rather than the right and that he wasn't and couldn't have been catapulted through the gangway as he said he was, — that his story is inconsistent with and contradicted by the admitted physical facts and by fundamental natural laws with which we are all familiar." Both of these contentions received careful consideration when this case was last before this court (*Watkins* v. *Railroad*, 83 N. H. 10, 12–13), and were rejected. No sufficient reason for their further consideration appears. "A question of law once decided is not reconsidered in the same case except upon a motion for rehearing." *Olney* v. *Railroad*, 73 N. H. 85, 91, and cases cited.

2. The presiding justice denied defendant's request for an instruction that there was no evidence from which it could be found that "the curve near Davis Crossing contributed to cause this accident," and submitted to the jury the questions whether the accident happened on the curve and whether the curve contributed to cause the accident. The defendant's exceptions to these rulings raise a question which was not considered when the case was last here. *Watkins* v. *Railroad, supra,* 10, 13.

The defendant concedes that there is now "some evidence that the accident happened on a curve," but bases its contention that this curve could not have contributed to the accident upon two propositions of fact which it says are conclusively established by the evidence, *i. e.* (1) that a one-degree curve like that in question, having a radius of more than a mile, is so slight that "it is a curve in name only" and "for all practical purposes is no curve at all," which could not have caused the motion of the apron described by the plaintiff; (2) that the testimony as to the effect of a curve upon a loose apron "is limited in its application to the extremities of a curve and nobody claims that this accident happened when the engine was either entering or leaving the so-called curve in this case."

An examination of the record shows that neither of these claims was conclusively established by the evidence.

In regard to the possible effect of a one-degree curve, plaintiff introduced testimony of three expert witnesses, two of them locomotive engineers of many years' experience, and the third, a consulting mechanical engineer, all of whom gave it as their opinion that the curve in question would be sufficient to cause an accident such as the plaintiff described. This opinion was corroborated by the experience of a fireman formerly employed by the defendant, who testified that upon one occasion when he was firing a locomotive having a lateral play of one inch in the apron, he was thrown flat and to the right by

the motion of the apron so that he "nearly went out of the gangway" when the engine struck a left hand curve which "isn't a bad curve at all." Upon the foregoing testimony, the question of the adequacy of the curve as a contributing cause for the motion of the apron was clearly for the jury.

The plaintiff does not concede the accuracy of defendant's assertion that the testimony as to the effect of a curve on a loose apron "is limited . . . to the extremities of" the curve, but even if this portion of defendant's contention be accepted as sound, its argument must still fail, for the evidence would plainly justify a conclusion that the accident happened when the locomotive was leaving the curve in question. This curve commences at the south side of Davis' Crossing and extends south a distance of 250 feet. The plaintiff was picked up after the accident by a north-bound train and there was evidence that when it stopped for this purpose its locomotive stood 200 feet south of Davis' Crossing, which would bring it within the last third of the curve. There was also evidence from which it might be found that when this stop was made, Watkins' body lay opposite the baggage car, which was the second car in the train. These cars were approximately sixty feet long. Whether he lay opposite the front end, the center or the rear end of the baggage car, did not appear, but the foregoing testimony would justify a conclusion that he lay somewhere between 260 and 320 feet from Davis' Crossing, or from 10 to 70 feet beyond the south end of the curve. Making due allowance for the unavoidable inaccuracy of estimates of distance, it might properly be found that the plaintiff was picked up near the south end of the curve and that the accident happened when the engine was leaving it. Both of the questions submitted by the court to the jury were proper for their consideration, and defendant's exceptions to the denial of its request must be overruled.

3. In regard to the application of the boiler inspection act, the court charged the jury as follows: "It therefore appears under the statute in its present form that it is unlawful for any railroad to use in moving interstate traffic, and this was interstate traffic in this case, a locomotive, unless such locomotive and tender and all parts and appurtenances thereof are in proper condition and safe to operate in active service without unnecessary peril to life or limb. That was the obligation resting upon the defendant in this case, and that is the obligation which the plaintiff says the defendant failed to perform. This duty to have the locomotive and tender and all parts and appurtenances thereof in safe condition so that they could be used

without unnecessary peril to life and limb is an absolute and continuing duty. In this respect, the case differs from the ordinary case of master and servant, for the statute does not say that the railroad shall have their engines as safe as they can by the exercise of reasonable care or that it shall be liable only for defects which might have been discovered by proper inspection, but it lays down a rule of law that the engines must be in proper condition, and if a defect in its condition causes injury to an employee, then the railroad is liable whether it had any knowledge of its existence or not." To this portion of the charge the defendant excepted as follows: "The defendant excepts to the court's construction of the boiler inspection act, meaning the language of the statute as applied to this case, and the statement of the duties of the defendant arising therein. Also to the construction of the words 'proper condition and safe to operate in use' under the statute; and to the charge of the court which allows no modification or leeway in the meaning of 'proper condition and safe to operate.' The defendant also excepts to that portion of the charge in which the jury are told in substance that the railroad has a duty to do more than make the engine reasonably safe to operate and keep it in reasonably proper condition."

The court's statement of the defendant's duty, incorporating as it did the language of the statute, was obviously correct as a legal proposition. The statement that the duty was absolute and continuing was apparently taken from the opinion of the supreme court in *Baltimore &c. R. R. Co.* v. *Groeger*, 266 U. S. 521, 527. The criticism now leveled against this portion of the charge is that it was susceptible of misunderstanding and calculated to mislead the jury. Defendant's argument is that "from this the jury would naturally understand, that it was the railroad's duty to maintain its engine and tender and appurtenances in an absolutely safe condition under all circumstances." This argument clearly ignores the force of the words "unnecessary peril" which occur twice in the language of the court. The duty of the railroad, as stated to the jury, was to provide against unnecessary perils. At no time was it suggested that it was bound to obviate the dangers which are necessarily inherent in railroad operation. Unless it is to be assumed that the jury similarly ignored the effect of these important words, defendant's argument is clearly unsound, and of course the presumption is the other way. The jury is presumed to have understood and followed the instructions of the court. *Wier* v. *Allen*, 51 N. H. 177, 180; *Wendell* v. *Moulton*, 26 N. H. 41, 63; *Janvrin* v. *Powers*, 79 N. H. 44, and cases cited.

Furthermore, the court undertook to give the statutory rule a more specific application to the case in hand by pointing out the distinction between the obligation imposed by the act upon the defendant and the usual common-law duty of a master. This distinction appears to have been correctly stated in accordance with the principles laid down in the *Groeger* case, *supra*, and no criticism of the charge upon this point is made by the defendant. As an explanation of the defendant's statutory obligation which had previously been stated in the language of the act, it was specific and understandable, and accurately indicated the most important effect of the act under the circumstances disclosed by the evidence. There is no apparent reason for believing that the jury attributed to the statute a greater potency than that which the court pointed out to them.

It is argued, however, that the attention of the court was specifically called to the contention of the defendant that it was under no duty "to do more than make the engine reasonably safe to operate and keep it in reasonably proper condition," and that the trial court was, therefore, called upon to deal specifically with the point thus presented in accordance with the rule laid down in *Burke* v. *Railroad*, 82 N. H. 350, 361. It is now contended that "the true rule is that the defendant owes the absolute duty of maintaining its engine and appurtenances in such condition that they may be reasonably safe to operate, taking into consideration the dangers inherent in such operation," and the contention is that the charge should have contained a statement to this effect.

It should be noted that no request for instructions embodying the rule now suggested or any different rule from that enunciated by the court was submitted at the trial. It should also be noted that no one of the three exceptions which were taken to this portion of the charge presented to the court the rule now advocated as correct. The first exception was a general one to the court's construction of the boiler inspection act, and the statement of the duty of defendant thereunder. The second was a complaint that the charge allowed "no modification or leeway" in the meaning of the words "proper condition and safe to operate." The reason for the third exception is that the jury were told that the railroad had a duty "to do more than make the engine reasonably safe to operate and keep it in reasonably proper condition." Without further explanation, which does not appear to have been given, the third exception might properly be understood as asserting that the common-law rule of negligence should be applied. It could hardly be expected that a trial judge,

in response to these exceptions, would have undertaken to modify his charge along the lines now suggested or that he would have hit upon the "true rule" which counsel have since had leisure to formulate. This was clearly a situation which called for a request for instructions, if counsel wished to raise the question now presented, and from the way in which the exceptions were taken, it is difficult to avoid the conclusion that they were more interested in getting a possibly valid exception to the charge than in securing a correct statement of the law. The present exception may, therefore, be overruled upon the ground that the statement of the law was not erroneous and that the question now argued was not properly presented at the trial.

We are not prepared to announce at this time, however, that the rule contended for by the defendant is a true statement of its duty under the boiler inspection act. As a basis for its argument upon this point the defendant correlates two widely separated quotations from the opinion in the case of *Baltimore &c. R. R. Co.* v. *Groeger, supra.* It is well understood that this method of quotation may result in substantial misquotation, and there is room for the conclusion that we are here confronted by an instance of that kind. The two quotations are as follows: "The requirement of the statute is substituted for the common-law rule which holds the employer to ordinary care to provide his employees a reasonably safe place in which, and reasonably safe appliances and machinery with which, to work. . . . By the last-mentioned section, defendant was bound absolutely to furnish what before, under the common law, it was its duty to exercise ordinary care to provide." The first of these quotations appears on page 523 of the official report, and the second on pages 528 and 529. The conclusion which the defendant draws from them is as follows: "If this language of the Supreme Court of the United States (the ultimate authority on this subject) means anything, it means that the defendant's *common law duty to use ordinary care to provide reasonably safe appliances* has been replaced by *an absolute statutory duty to provide reasonably safe appliances.*" Whatever strength there might have been in this argument if the two quotations above set forth had been consecutive, disappears when the context in which they occur is considered, and when defendant's conclusion is compared with other statements in the same opinion.

The court's statement of the common-law rule occurs during a discussion of the claim of the defendant in that case that "§ 2 of the Boiler Inspection Act.prescribes no definite or ascertainable standard

of duty," and the first quotation set forth above is succeeded by the following sentence, "It is as definite and certain as is the common-law rule; and to hold that the duty imposed cannot be ascertained would be as unreasonable as it would be to declare that the common-law rule, which is ordinarily applied in personal-injury actions brought by employees against employers, is too indefinite to be enforced or complied with." The second quotation occurs during a discussion of the defendant's claim that it could not be found negligent by reason of its failure to equip the crown sheet of its boiler with a fusible safety plug and was succeeded by the following sentences: "The carriers were left free to determine how their boilers should be kept in proper condition for use without unnecessary danger. The things required for that purpose were not prescribed or changed by the act; but use of boilers, unless safe to operate, as specified, was made unlawful, and liability for consequences follows violation of the act. It is a well-established rule that the master is not bound to furnish the latest or best tools or appliances for the use of his servants. That rule is applicable here, and we hold that defendant was not liable for failure to furnish the best mechanical contrivances and inventions, or to discard appliances upon discovery of later improvements, provided the boiler was in proper condition and safe to operate, as required by the statute."

It is therefore apparent that the two statements to which the defendant gives such an intimate connection were not so correlated in the mind of the court when the opinion was written. No statements of law such as are now advocated by the defendant appear in the opinion, and the following passages, in addition to those set forth above, are entirely inconsistent with the claim now made. "Defendant's duty to have the boiler in safe condition to operate, so that it could be used without unnecessary peril to its employees, was absolute and continuing. No notice to the defendant, actual or constructive, of the defects or unsafe condition of the boiler, was necessary to plaintiff's case. Defendant is liable if its breach of duty contributed to cause the death." *Ib.*, 527. "The court, in harmony with the provisions of §2, instructed the jury that the standard of defendant's duty was to put and keep the locomotive in proper condition and safe to operate, and that it would be a violation of defendant's duty if the engine, as to the crown sheet, was permitted to be in such a condition that it could not be employed in the active service of the carrier, moving the traffic, without unnecessary peril to life or limb." *Ib.*, 527, 528. "The act required a condition which would permit use

of the locomotive without unnecessary danger. It left to the carrier the choice of means to be employed to effect that result." *Ib.*, 530.

The *Groeger* case decides one point plainly and specifically. It holds that the statute did not abrogate the common-law rule that "the master is not bound to furnish the latest or best tools or appliances for the use of his servants." This portion of the decision has no vital bearing upon the present case. So far as a railroad's liability for a lack of repair in its locomotive was concerned, the court added very little by way of explanation of the words of the statute, except the assertion of the absolute nature of the duty imposed. It certainly laid down no such rule as that which the defendant deduces from the language above quoted. We, therefore, conclude that the charge of the court was not inconsistent with the opinion in the *Groeger* case but really corresponded closely with the instruction which was approved therein.

4. The defendant further excepted to the charge as follows: "The defendant also excepts to that portion of the charge in which the jury are told that they need not consider a curve, low joint or uneven track if they believe the plaintiff's story that the apron was defective and threw him." The portion of the charge to which this exception was directed reads as follows: "If you accept the plaintiff's present testimony and you find that the lateral play in the apron was in whole or in part responsible for this accident, your verdict would be for the plaintiff, and it would not be necessary for you to determine whether any other factors such as a curve or low rail or joint or rail out of line entered into and combined to bring about the result. In such a view of the case, the exact point where the accident occurred would be immaterial."

The defendant now argues that the foregoing instruction was erroneous because the jury were thereby told "that they could find a verdict for the plaintiff if they found that he was thrown even though they could find no reason for it," and "that they could find liability without finding the cause of the accident."

This criticism of the charge is unfounded. The jury were not told that they could find for the plaintiff if they were satisfied that he was thrown, but only if they found that the lateral play of the apron caused the accident. They were not told they could find for the plaintiff without finding the cause of the accident, but if they found that a condition for which the defendant was liable contributed to cause the accident they need not determine whether other factors entered into the train of causation.

There is a similar lack of merit in the argument that this instruction permitted "a finding that lateral play in an apron would cause the tremendous throw to which the plaintiff testified without any other contributing factor." The case was tried throughout upon the theory, so clearly understood by all that it was seldom stated explicitly, that a loose apron could not move in any unusual way unless acted on by some condition of the track, and the obvious meaning of the court was that if the jury believed that the apron did move violently and throw the plaintiff as he claimed, they need not determine which of several possible contributing causes was in operation at that time. This conclusion is supported by later portions of the charge in which the jury were told that if they believed the plaintiff's story that "the apron lifted, lurched and threw him" they could then infer "that there probably was a defect in the rail such as would cause what did happen." Although the defendant also excepted to this instruction, it was clearly sound, both in logic and in law, as indicated in the first opinion rendered in this action. *Watkins* v. *Hustis*, 79 N. H. 285, 287.

The trial judge, in the instruction now under consideration, was apparently trying to give effect to the following statement of this court: "Since there was direct evidence that the plaintiff was thrown by the apron, circumstantial evidence of that fact was not indispensable. Consequently, the plaintiff does not fail because of the absence of evidence of any specific defect in the track." *Watkins* v. *Railroad, supra*, 13. Although language better suited to accomplish this purpose might be chosen, this portion of the charge was, under the circumstances, unexceptionable.

5. The court did not err in denying defendant's requests numbered 6 and 7, which were in substance that if there were no such lurch in passing over the point of accident as to be noticeable to the other occupants of the engine, the verdict should be for the defendant. This was not a request that the court "inform the jury what the law is in its application to the case" (*Simoneau* v. *Railway*, 78 N. H. 363, 365), but that they be instructed to decide the case upon selected portions of evidence. Such requests are properly refused. *Ordway* v. *Sanders*, 58 N. H. 132; *State* v. *Newman*, 74 N. H. 10, 21; *Lockwood* v. *Company*, 76 N. H. 530, 532, 537; *Boiley* v. *Railroad*, 78 N. H. 564, 566.

*Judgment on the verdict.*

Snow, J., did not sit: the others concurred.