Belknap,
May 3, 1932.

## Michael Smith *v*. Boston & Maine Railroad.

*Tilton & Tilton (Mr. Frederick A. Tilton* orally), for the plaintiff.

*Jewett & Jewett (Mr. Theo S. Jewett* orally), for the defendant.

Snow, J.   The track of the defendant's White Mountain division runs north and south through Laconia, and at the point in question cuts off a tract of shore property to the west thereof on which are situate the Dow coal sheds, oil storage tanks, junk sheds, etc.   The severed tract is accessible only by a private way leading westerly from Messer street across the railroad at the Dow crossing, so called. The defendant's track coming from the south curves slightly to the east along, and below, a steep embankment some ten or twelve feet high, the crossing being approximately at the center of the curve. The way leading from Messer street proceeds westerly on the higher level about 150 feet between buildings on either side, and then, curving sharply to the right drops down the side of the embankment, and approaches the crossing at an angle of about forty-five degrees.   It then curves to the left over the main track and across two sidetracks extending northerly and a spur track extending southerly.   The first

or nearest sidetrack leaves the main line at a point one hundred and twenty feet south of the crossing, and the second branches from the first at a point twenty feet south of the way. The spur runs south from the second siding and crosses the way about twenty feet west of the latter track. The driver of a vehicle arriving from the east necessarily approaches the track on a descending grade with his back turned diagonally to the south. His view of an engine approaching from the south, as well as the corresponding view of the engineer, is obstructed by the embankment which is parallel to the tracks and about twenty-five feet easterly of the easterly rail. The private way is about fifteen feet in width and somewhat difficult of negotiation for a truck because of the grade and curves. The crossing, to the knowledge of the defendant, had been for many years in constant use during business hours and was unprotected by any device, signal, or rule. To the knowledge of both parties the crossing was dangerous as respects vehicles approaching from the east.

The plaintiff, sixty-four years of age, was experienced in driving a truck. He had been engaged in making delivery of coal from the Dow sheds for somewhat more than a year preceding the accident, passing over the tracks three or four times daily, and had had earlier familiarity with the crossing. He knew there were regular trains, but did not know the schedule. He was on his way to the sheds in the mid-afternoon of an October day when the accident occurred. He testified that it was his custom to slow down and stop before pitching down the grade, to put his gear into low, go down close to the crossing, stop there and look south, then north, and thereupon go ahead; that on the day of the accident, following this custom, he brought his truck to a stop with the front end of his truck at a distance which he estimated to be twelve or fifteen feet from the track or a little closer; that he saw no train coming and heard nothing; that he then stepped on the gas and "hurried up to get across"; that after he started to cross he did not look either way again; that he had to keep his eye on the track to see where he was going; that he did not believe he could have steered the truck if he had kept his head turned sideways watching for a train; that the emergency whistle sounded when he was on the track a few seconds before the collision; that the engine struck the truck in the back, overturned and threw it diagonally onto the sidetrack a distance of fifteen or twenty feet; that he was trying to be careful and thought he was.

The only other eye witness to the accident was the engineer. His experience in that employment had covered twenty-eight years, of

which the last three were upon this line. His engine, of the Pacific type, drew a train of five cars. The train made stops at Laconia and at Lakeport, approximately equidistant from the crossing. It was traveling at a speed of about twenty-five miles per hour. The engineer testified that the bell, electrically operated, was started ringing at Laconia station, and rung continuously until after the train stopped following the accident; that he was on his seat looking ahead; that he blew no whistle for the crossing; that when the front of the locomotive was at an engine's or car's length (65 to 70 feet) therefrom, he saw the truck approaching "very slowly" and "very close" to the track, but "didn't have an idea but what he [the driver] was going to stop"; that when he saw that he was not, and "was practically on the crossing," he immediately put the brake into emergency, gave a warning whistle and stopped his train in four car lengths; that he had, at different times, seen cars on either side of the crossing waiting to pass and knew that the crossing was a blind one "in view of the banking," and that he could not see cars or trucks until he "got very close to the crossing."

No measurements were given in evidence of the distance a driver of a truck, when twelve or fifteen feet from the crossing, could see down the track, or at what point on the track an engineer could first see an approaching truck similarly placed. While the plaintiff, on cross-examination, assented to counsel's demonstration upon the defendant's plan that he ought to be able to see down the track three hundred and twenty feet, he declined to give an estimate of such distance. The defendant's engineman, however, estimated that he could first get a view of the planking of the crossing when two hundred feet therefrom.

The defendant offered in evidence a statement attributed to the plaintiff while he was being extricated from the truck, variously phrased by the defendant's trainmen "I was looking the other way and I didn't see you"; that "he was looking the wrong way"; "I did look but I looked the wrong way"; "he couldn't really tell, but . . . he heard the whistle and he looked the wrong way." In rebuttal the plaintiff denied making any statement that he did not look. If the evidence of the trainmen could be construed as contradicting the plaintiff's testimony its interpretation and weight were for the jury.

The defendant contends there was no evidence to support a finding of its negligence, and that the evidence conclusively establishes the plaintiff's want of care. A mere statement of the facts discloses that neither contention is maintainable.

As to defendant's negligence, it could be found that the protection afforded by ringing the engine bell was not commensurate with the requirement of ordinary prudence in operating a train at the admitted speed over a crossing of the character shown.

As respects the plaintiff's negligence, the evidence particularly relied upon is the admission of the plaintiff that, after stopping at a point twelve or fifteen feet from the crossing or closer and looking both ways, he started his truck and hurried across the track without again looking up or down the track. The contention is that this conduct constituted conclusive evidence of negligence. The answer is that the law does not adopt particular circumstances as the measure of due care. *Byron* v. *Railroad*, 82 N. H. 434, 438 and cases cited. The rule, as defined in this jurisdiction holds the actor only to the standard of care of the average prudent person under all the circumstances. *Id.*; *Charbonneau* v. *MacRury*, 84 N. H. 501, 509; *Bridges* v. *Company, ante*, 220, 227. The application of such standard was for the jury if on the evidence reasonable men might disagree. It cannot be said that no reasonable man could find that a man of average prudence, confronted as the plaintiff was with the difficulty of the operation and steering of the truck on the narrow and curving way across the tracks, would not have done as the plaintiff did.

The exception to the failure of the court to specifically charge that there could be no recovery if both plaintiff and defendant were negligent does not avail the defendant in the absence of a request for such an instruction. However, such a ruling is inferentially and sufficiently covered by the charge as given.

The answer to the defendant's several exceptions to the denial of its requests for instruction is found in the rule, already noted, that the law does not adopt particular circumstances as the test of ordinary care. The substance of the requested instructions was given so far as the defendant was entitled to them.

The exceptions to the admission and exclusion of evidence have not been urged in argument, and have not been considered.

*Judgment for the plaintiff.*

All concurred.