Hillsborough,
Dec. 5, 1933.

BLANCHE PEPPIN *v.* BOSTON & MAINE RAILROAD.

LOUIS PEPPIN *v.* SAME.

396

*Murchie, Murchie & Blandin (Mr. Alexander Murchie orally)*, for the plaintiffs.

*Warren, Wilson, McLaughlin & Bingham (Mr. Bingham orally)*, for the defendant.

Marble, J. The defendant's railroad runs parallel with Canal street and with the Amoskeag mills. The mills are on the west of the railroad and Canal street on the east. To enter the mills it is therefore necessary to cross the tracks. These tracks are two in number, one for the north bound and one for the south bound trains. Middle street enters Canal street from the east.

At the close of work on January 14, the plaintiff left the mill and walked across the tracks to the sidewalk on the northwest corner of Canal and Middle streets, where she expected to meet her husband. She failed to find him, however, and started back toward the mill intending to join her sister-in-law in the mill yard and then go home by a more convenient exit. She had reached the west rail of the west or south bound track when the accident occurred. The train was about ten minutes late. Three or four hundred operatives were leaving the mill at that time and passing over the crossing. The gates had been out of order since noon, when the gateman had been unable to lower them. The gateman was present, however, with a flag.

Private crossings are constructed for the accommodation of individuals (P. L., c. 249, s. 1), and there is no statutory obligation imposed upon a railroad to protect such crossings for the benefit of the public. A railroad may of course so maintain a private crossing as to make it essentially a public one. *Stocker* v. *Railroad*, 83 N. H. 401, 402; *Morris* v. *Railroad*, 85 N. H. 265, 274. But such is not the situation here.

Far from electing to treat the Middle street crossing as public, the railroad entered into a contract with the Amoskeag company, for whose benefit the crossing was established, whereby that company agreed to operate the crossing gates for the protection of its own employees. It is significant that in the same contract the railroad agrees that it will itself "protect the crossing at the foot of Stark street as in the case of a public highway."

Since the crossing was in effect a part of the mill entrance, its use was obviously restricted to the company's operatives. There is no evidence that the general public had ever had occasion to cross the tracks at that point. The plaintiff's right to use the crossing could be no greater than that of the company, and the company had agreed to maintain and to operate the gates. *Wentworth* v. *Railroad, ante,* 251.

There is nothing in the contract which bears out the plaintiff's contention that the relation of principal and agent was created. No words indicative of that relation are used, and the provision relating

to indemnity is a recognition of the fact that, so far as third persons are concerned, the company will be subject to liability for crossing accidents, since it is to have complete and independent control of the crossing gates.

The cases cited by plaintiff's counsel in support of the proposition that the maintenance of gates at a private crossing is a non-delegable duty devolving upon the railroad are cases involving duties which a railroad owes not to an individual but to the public.

Private crossings may be established by agreement of the parties. *Bolger* v. *Railroad*, 82 N. H. 372, 374. The contract in the present case is one which could properly be made (*Wentworth* v. *Railroad*, *ante*, 251), and in the absence of notice to the contrary, the defendant was entitled to assume that the company's undertaking would be adequately performed.

It was the gate tender's duty to open the mill gates at morning, noon, and night and to tend the crossing gates while the operatives were entering and leaving the mill. During the rest of the day the crossing gates were closed and the gate tender had other duties to perform in the mill yard and elsewhere. Finding it impossible to lower the gates after he had raised them at noon on the day of the accident, he notified the Amoskeag yard boss, as was his custom whenever the gates were out of repair.

The defendant had no express notice that the gates could not be lowered, and there is no evidence from which notice of this fact could properly be inferred. The plaintiff's claim that trains were passing at this point so frequently that the railroad was charged with notice is untenable. The gates were up but a few hours, and the gate tender was unable to state whether many or few trains went by the crossing during the day. In the case of *Lovett* v. *Railway*, 85 N. H. 345, 349, cited by the plaintiff, the condition complained of had existed for three weeks and cars were passing every few minutes.

The plaintiff's evidence tended to prove the following facts. On the evening of the accident the engineer blew "the regulation whistle" for the West Bridge street crossing, which was north of Middle street. It was the gateman's duty to listen for that particular crossing signal and he heard it on this occasion. A special whistle for the Middle street crossing was not required either by statute, rule, or custom. Near the Amoskeag station, which was a few miles north of the mill, the automatic air bell was set in motion, and it continued to ring until after the accident. The engineer had shut off steam just north of Amoskeag station, and the speed was not excessive. The head light was on.

The plaintiff cites *Smith* v. *Railroad*, 85 N. H. 463, 466, in support of her claim that the ringing of the engine bell could be found to be insufficient protection. But in the *Smith* case there were no gates on which the engine-men were entitled to rely; nor was there a flagman, as in *Wentworth* v. *Railroad*, ante, 251.

It does not conclusively appear that the plaintiff's conduct was negligent. If the train had not been late, it would have passed the crossing ten minutes before the regular time for the operatives to leave the mill. The gates were up, and "there were others crossing" toward her. There was ice on the ground; "it was slippery," and she "was watching" where she "was stepping." She knew that the gates were closed when trains passed, and she had never seen a train go by when the gates were not closed. She didn't pay attention because she "didn't think of anything coming as the gates were open."

"The plaintiff's case is thus brought within the rule that due care can be found from the party's reliance upon the customary conduct of others." *Haywood* v. *Railroad*, 79 N. H. 520, 521, and cases cited.

To quote from the plaintiff's brief, "It was a very dark, stormy, misty and foggy night." The evidence does not warrant a finding that either the engineer or fireman saw the plaintiff, or were at fault for not seeing her, until the engine had reached a point about 120 feet distant from the crossing. This, however, does not necessarily preclude recovery, for if the accident could have been avoided by the exercise of reasonable care on the part of the engineer or fireman after they were aware of the plaintiff's danger, the defendant would be liable. *Tyrrell* v. *Railroad*, 77 N. H. 320; *Pitman* v. *Merriman*, 79 N. H. 492.

The case was submitted to the jury under the general instruction that "Whatever a reasonable person would naturally have done to avoid an accident in this instance, the parties involved were legally bound to do." The contention that the plaintiff was a trespasser need not be considered. Whatever the plaintiff's status, the defendant was liable "for negligent acts of intervening force" after her presence was known. *Castonguay* v. *Company*, 83 N. H. 1, 6.

The distance from the east rail of the north bound track to the west rail of the south bound track was 16.4 feet. The fireman saw the plaintiff between the rails of the east or north bound track when the train was "a little more" than 120 feet north of the crossing. He shouted, "Whoa!" and the engineer put on the emergency brakes immediately. The speed of the train was twenty miles an hour. On that basis the engineer had at least four seconds in which to act. But

since the brakes "were working all right" and took effect at once, he had, in point of fact, a somewhat longer time. It was storming and the rails were wet. Although the engineer knew that sand would increase the "braking surface on the rail," he did not apply sand because it had never been his practice to do so "in making an emergency stop." It took but a "fraction of a second" to put on the brakes.

His testimony concerning the whistle follows: "Q. Did you blow the whistle? A. No sir. Q. In that engine where was the whistle with reference to where you were sitting? A. Right up over my head —that is, the cord. Q. The cord was right over your head? A. Yes. Q. And you used one hand to throw in the emergency? A. Yes sir. Q. And the other hand was free to blow the whistle? A. I didn't blow the whistle. Q. The other hand was free to? A. Rather a difficult performance. Q. You would have to reach up and pull the cord? ... You can do it in a fraction of a second? A. Fraction of a second, yes."

When the fireman first saw the plaintiff, she was walking at "an ordinary gait." She continued toward the mill, "not very fast," for a distance of about fifteen feet, and was struck, when beyond the west rail of the south bound track, by the right-hand beam or cylinder head of the locomotive.

It could therefore be found that a slightly quicker stop, which, according to the expert testimony, could have been accomplished by the use of sand, or (in the opinion of a majority of the court) a sharp blast of the whistle, following the application of the brakes, would have prevented the accident.

A former locomotive engineer, called by the plaintiff, testified: "Q. Now will you tell us from your experience whether or not the emergency brake can be thrown on at the same time the whistle is blown by the engineer? A. Yes. Q. And how quickly can the whistle be blown? A. Can both be done at the same time. Q. I mean in the matter of time, if an engineer wants to blow the whistle how quickly can he do it? A. Just as quick as he can put the brake on, use both hands. Q. The matter of time? A. Fraction of a second."

The train consisted of the engine, tender, and six cars. When it stopped, the third car was on the crossing. The plaintiff's expert testified that it was the "practice and rule" that sand "must be used in case the brake is thrown into emergency," and that with the "proper application of the emergency and sand," the train, under the conditions described, "could be brought to a stop in 130 feet."

There was no error in the denial of the motions for a nonsuit and

directed verdict. *Stocker* v. *Railroad,* 83 N. H. 401, 404; *Jones* v. *Railroad,* 83 N. H. 73, 82, and cases cited. The jury verdict must, however, be set aside.

The gate tender, the engineer, and many other witnesses testified positively that the engine bell was ringing at the time of the accident. The only negative testimony relating to the matter was that of the plaintiff, who was not paying attention and merely said she did not hear it; that of the witness McPherson, who said, "I don't remember hearing anything, I don't hear very well," and that of the witness McGuigan, who, when asked if he remembered hearing a bell, answered, "No, I don't remember."

The defendant excepted to the refusal of the court to grant the following request for instructions: "In the face of direct evidence that the engine bell was rung and was ringing at the time of the accident, the testimony that the bell was not heard by some witnesses amounts to no more than a *scintilla,* and you will find that the engine bell was ringing."

The presiding justice gave no instructions on the subject. While the request erroneously called for an affirmative finding rather than a ruling that the plaintiff had failed to sustain the burden of proof on that particular issue (*Collette* v. *Railroad,* 83 N. H. 210, 216), it called to the attention of the court an important rule of law, material to the case, on which the defendant was entitled to instructions. *Burke* v. *Railroad,* 82 N. H. 350, 361, 362. See *Morier* v. *Hines,* 81 N. H. 48, 53, and cases cited. Under the charge as given, the jury were at liberty to find that due care required the ringing of the bell and that the bell was not rung.

The defendant's requests numbered thirty-two, and the only exception to the denial of this particular request was a general exception to the "refusal to charge as requested, in so far as the defendant's requests were refused." The plaintiff contends that this exception is unavailing.

While there is much authority to support this contention (64 C. J. 954, 955), it has long been the practice in this state to leave the matter largely to the discretion of the presiding justice, who may, if he finds it essential, require counsel to specify the omissions claimed. Although the requests in the present case were numerous, they were not involved. Many of them were statements of conventional rules and demanded but brief consideration. It does not appear that the plaintiff (whose counsel were furnished presumably with a copy of the requests) was prejudiced by the procedure adopted.

Since the questions presented by the remaining exceptions are not likely to arise at a later trial, they have not been considered.

*New trial.*

All concurred.