Hillsborough, }
May 5, 1936. }

### BLANCHE PEPPIN *v.* BOSTON & MAINE RAILROAD.

### LOUIS PEPPIN *v.* SAME.

*Murchie, Murchie & Blandin* (*Mr. Alexander Murchie* orally), for the plaintiffs.

*Warren, Wilson, McLaughlin & Bingham* (*Mr. Bingham* orally), for the defendant.

BRANCH, J. We repeat without change many of the statements of fact contained in the former opinion.

"The defendant's railroad runs parallel with Canal street and with the Amoskeag Mills. The mills are on the west of the railroad and Canal street on the east. To enter the mills it is therefore necessary to cross the tracks. These tracks are two in number, one for the north bound and one for the south bound trains. Middle street enters Canal street from the east."

The gates at the Middle street crossing had been installed by the defendant but were operated by the Amoskeag Manufacturing Company by virtue of a written contract with the defendant.

It was the duty of the gate tender employed by the Amoskeag Company, to open the mill gates at morning, noon, and night and to tend the crossing gates while the operatives were entering and leaving the mill. During the rest of the day the crossing gates were closed and the gate tender had other duties to perform in the mill yard and elsewhere. Finding it impossible to lower the gates after he had raised them at noon on the day of the accident, he notified the Amoskeag yard boss, as was his custom whenever the gates were out of repair, but at the time of the accident they had not been repaired and could not be lowered.

"At the close of work on January 14, the plaintiff left the mill and walked across the tracks to the sidewalk on the northwest corner of Canal and Middle streets, where she expected to meet her husband. She failed to find him, however, and started back toward the mill intending to join her sister-in-law in the mill yard and then go home by a more convenient exit. She had reached the west rail of the west or south bound track when the accident occurred. The train was about ten minutes late. Three or four hundred operatives were leaving the mill at that time and passing over the crossing."

Although the gates could not be closed, the gateman was present endeavoring to keep the crossing clear by the use of a flag. The fireman testified that he saw the plaintiff between the rails of the north bound track when the train was a little more than 120 feet north of the crossing. He then shouted "whoa" and the engineer put on the emergency brakes immediately. It is not argued that he could or should have discovered her presence earlier. At no time before the accident was the engineer able to see the plaintiff, because the projecting boiler of the locomotive cut off his view to the left.

The weather was misty and the rails were wet. Although sand increases the power of the brakes and although the use of sand in making an emergency stop is common practice and is required by a rule of the defendant, the engineer made no attempt to use it after applying the brakes. Neither did he blow the whistle. After the plaintiff had passed the west rail of the south bound track her dress was caught by the cylinder head of the locomotive which overhangs the rail about two feet. As a result, she was thrown to the ground and suffered the injuries of which she complains.

Upon the previous transfer of these cases it was held that the plaintiff was entitled to go to the jury upon the issues of her own due care and the negligence of the engine crew after her presence upon the right of way was discovered. The vital conclusions which we then reached were stated as follows:

"It could therefore be found that a slightly quicker stop, which, according to the expert testimony, could have been accomplished by the use of sand, or (in the opinion of a majority of the court) a sharp blast of the whistle, following the application of the brakes, would have prevented the accident." *Peppin* v. *Railroad*, 86 N. H. 395, 400.

Although it is well understood that "a question of law once decided is not reconsidered in the same case, except upon a motion for rehearing," (*Olney* v. *Railroad*, 73 N. H. 85, 91, and cases cited; *Wat-*

*kins* v. *Railroad*, 84 N. H. 124, 126; *Small* v. *Railroad*, 87 N. H. 25) we are now asked to reconsider both of these conclusions because it is asserted that the evidence at the last trial established new facts of controlling importance.

With reference to the use of sand, the defendant produced evidence of tests made with an engine of the same type as that which struck the plaintiff, for the purpose of determining the time required for sand to take effect after the sand lever in the cab was turned. The results of these tests, as reported by the defendant's employees, indicated that it took three seconds for sand to reach the rail after the sand box was opened. Upon the basis of this evidence, the defendant now argues that if the engineer had used sand after making an emergency application of the brakes, it could not have reached the rails in time to take effect before the plaintiff was struck, and hence that the failure of the engineer to use it was not causal.

There are a number of reasons why this argument cannot prevail. One is that the evidence now relied on in support of the motions for nonsuits and directed verdicts came from the defendant's own witnesses, who were its employees, and nonsuits or directed verdicts are not ordered in such cases. *Giroux* v. *Insurance Co.*, 85 N. H. 355, 356, and cases cited. A plaintiff is entitled to have such evidence weighed by the jury, which may entirely disbelieve it. *Nawn* v. *Railroad*, 77 N. H. 299, 305.

Another answer to the defendant's argument is that the tests above referred to did not conclusively establish the correctness of the reported results, since they were made with the engine in a stationary position and the conditions, therefore, were not the same as those which prevailed at the time of the accident. There appears to be nothing inherently unreasonable in the suggestion made by the plaintiff's counsel upon cross-examination that with the engine in motion, sand might reach the rail more quickly than when the engine was at rest. The opinions of qualified witnesses upon this point were conflicting and inconclusive.

Even if the results of these tests were accepted as accurate, however, we could not say, as a matter of law, that an application of sand would not have averted the accident. As at the previous trial, the evidence clearly justified a finding that approximately four seconds elapsed between the time when the fireman signalled the engineer to stop upon discovering the plaintiff's peril and the time when she was struck. The distance between the east rail of the north bound track and the west rail of the south bound track is 16.8 feet. The over-

hang of the locomotive was approximately two feet. The distance from a point midway between the rails of the north bound track to the west rail of the south bound track was 14.4 feet, but there is nothing in the fireman's testimony that compels the conclusion that the plaintiff was precisely at this point when he saw her. Viewing the evidence in the light most favorable to the plaintiff, it might be found that she traveled a distance of as much as 18 feet after the fireman saw her and before she was struck. There was evidence that she walked at a "normal gait" and both parties agree that three miles per hour is a fair estimate of her rate of progress.

Upon this basis it might be found that it took her at least four seconds to travel the distance from the point where she was first observed to the point where she was struck and that the engine crew had that length of time to take action for her protection. There was evidence that the brakes could be applied in "a fraction of a second" and that it would take no longer to operate the sand lever. There was also evidence at the last trial that the locomotive did not strike the plaintiff's body at all, but barely caught her clothing, which indicates that the slightest additional slackening of the train's speed would have prevented the accident. We think that, upon this evidence, it was a permissible conclusion that if the engineer had promptly applied the sand it would have reached the rail in time to accomplish this result.

The engineer testified that when he received the warning from the fireman he knew "that there was undoubtedly somebody on the track," and that the fireman's shout meant for him "to stop as quick as possible." Since the use of sand increases braking power and hence facilitates a quick stop, it might be found that the engineer's failure to use it was negligent.

When the cases were here before, the uncontradicted evidence, which was accepted by both parties as true, indicated that "The speed of the train was twenty miles an hour." *Peppin* v. *Railroad, supra,* 399. At the last trial all estimates of speed were raised to thirty or thirty-five miles per hour. The defendant now argues that since the plaintiff was discovered, according to the engine crew, when the train was about 120 feet from the crossing, and since, at a speed of thirty miles per hour, it would traverse this distance in less than three seconds, the engineer had not more than 2.7 seconds in which to act after making allowance for the slowing up of the train after the brakes were applied and the time necessary for the transmission of the fireman's direction to stop. The argument may be shortly

answered. Whatever may have been the distance of the engine from the crossing when the fireman first saw the plaintiff between the rails of the north bound track, it cannot be denied that it arrived at the crossing in time to catch her dress. Therefore, it used up the same space of time, approximately four seconds, that plaintiff consumed in traversing a distance of approximately eighteen feet. If its speed was twenty miles per hour it was 120 feet distant from the crossing when the fireman first sighted the plaintiff. If its speed was thirty miles per hour, this distance must have been about 180 feet. Hence the variation in the estimates of the speed of the train at the several trials was not of controlling importance. It merely raises a question of comparative accuracy between the estimates of distance and those of speed.

Since the plaintiff was entitled to go to the jury upon the issue of the engineer's negligence in failing to use sand, the motion for a directed verdict was properly denied and we need not consider the effect of his failure to whistle.

In our earlier opinion the application of the last clear chance doctrine to the present situation was not considered because that principle had not been invoked at the first trial. At the last trial the issue of the defendant's liability under that doctrine was submitted to the jury and the defendant excepted. In support of this exception the defendant now argues that before the last chance rule can apply, "The party charged must actually know not only that the plaintiff is in danger but that he is unaware of his danger or physically incapacitated from saving himself from that danger," citing *Clark* v. *Railroad*, 87 N. H. 36. It is next asserted that "up to the moment she reached the easterly rail of the south bound track she [the plaintiff] was not in danger," and we are finally told that "In the case of this plaintiff any contention that the fireman or engineer did thus actually know of the plaintiff's ignorance is irrefutably answered by the fact that it was physically an impossibility; the huge, solid, impenetrable boiler, 50 feet long, which extended in front of the engineer and fireman, prevented any such possibility."

The answer to this argument is found in the following testimony of the fireman: "Q. You realized when you saw her out there moving that she was walking to a place of danger? A. Yes, sir. Q. And then you hollered to the engineer? A. Yes. ... Q. What did you holler? A. I don't know as I remember the exact word, but I think I hollered 'Whoa'. But it was that there was danger ahead, anyway." This testimony clearly justified a finding that the fireman

then "sensed the probability of a collision and realized his obligation to prevent it if possible." *Jones* v. *Railroad*, 83 N. H. 73, 81. Complete assurance on his part that the plaintiff was incapable of saving herself was not necessary to impose upon him the duty of taking protective action. "Certainty in regard to the future conduct of another is no more essential as a basis for the exercise of reasonable care under the last chance doctrine than in any other situation." *Small* v. *Railroad*, 87 N. H. 25, 27. The assertion that the plaintiff was not in danger until she reached a point where she would surely be hit by a passing train, hardly merits notice. When she was first seen, all the forces necessary to produce a collision were in operation. The situation, as the fireman realized, was then fraught with danger which, in the absence of intervention by someone, was sure to eventuate in injury.

The defendant seasonably requested the court to charge the jury as follows: "32. The Amoskeag Manufacturing Company had the sole duty and responsibility of properly maintaining and operating the gates at the Middle street crossing. The defendant (the Boston & Maine Railroad) had no duty whatever in connection with the operation or maintenance of these gates. If you find that the plaintiff, Blanche Peppin, was injured solely because of the failure of the Amoskeag Manufacturing Company, through its employees, to properly maintain and operate the gates at the Middle street crossing, your verdict will be for the defendant." With reference to this matter the court charged the jury as follows: "It has been suggested that the responsibility for the accident rested upon the Amoskeag Manufacturing Company. If you should find the Amoskeag Company wholly to blame, then there should be a verdict for the defendant, as to the railroad, but, if you find both the railroad and the Amoskeag Company partly to blame, then each would be liable, and the plaintiff would be entitled to a verdict against either or both, and any negligence of the Amoskeag Company would not prevent recovery from the railroad if it were also negligent.

"The Amoskeag Company had control of the operation of the gates, but not of the train, under its contract with the railroad company." The court thus gave, in less pointed language, the substance of the defendant's request and an exception to its denial would be overruled as a matter of course (*Gosselin* v. *Lemay*, 85 N. H. 13, 17; *Walker* v. *Railroad*, 71 N. H. 271) were it not for the fact that in another portion of the charge the court instructed the jury as follows: "The railroad had a right to expect the Amoskeag Company to per-

form its obligations under the contract for the maintenance of the gates and if they became out of repair so as not to permit their intended use, that the Amoskeag Company would exercise due diligence in restoring their use, and establish such safeguards during the period of the gates' disuse as would provide reasonable protection for those who have the right to pass over the crossing; unless the period of time was of such duration as would put the reasonable person in the exercise of ordinary care, upon notice, the temporary disrepair of the gates could not be chargeable to the railroad as negligent." "The engine men, operating defendant's trains, were duty bound to be as observant and watchful and have the trains of the defendant under such control as due and proper care requires .... In deciding whether it did or did not perform its duty in this respect, you may consider the conditions, such as the right to expect persons using the crossing would exercise proper care for their own safety; that the gates had been established and were being operated by a responsible agency, under a contract with it . . . ."

The defendant did not except to this portion of the charge, but now complains of the qualification contained in the words, "unless the period of time was of such duration as would put the reasonable person in the exercise of ordinary care, upon notice, the temporary disrepair of the gates could not be chargeable to the railroad as negligent." The defendant claims the right to take advantage of the error alleged to reside in this language under its general exception "to the refusal of the court to charge as requested."

The context clearly indicates that when the court used the language above quoted, it was dealing with the obligation of the enginemen to be observant and watchful, and their right to rely upon the performance of the Amoskeag Company's duty to maintain and operate crossing gates was referred to as one of the circumstances which might properly influence their conduct. In addition to the instructions previously quoted, the court, with reference to this phase of the situation, used the following language: "The railroad also has a right to, by agreement, establish private crossings at grade, and, in doing so, make certain agreements as to the maintenance of these crossings and the protection of those that may be expected to use them, and, likewise, for the protection of the railroad in the operation of its trains over and across this private crossing.

"Such a crossing was the one at the place this accident happened; . . ."

Under these circumstances, we think that the above quoted lan-

guage, although poorly chosen, should be construed to state merely that they could no longer rely upon the performance of this duty after the defendant had notice that the gates were out of repair. Thus understood, no serious doubt can be entertained regarding the correctness of this instruction as a statement of law, but it is argued that the court thus "left to the jury as an issue of fact a proposition, as to which the case is bare of evidence," and reference is made to our former conclusion that "the defendant had no express notice that the gates could not be lowered, and there is no evidence from which notice of this fact could properly be inferred." *Peppin* v. *Railroad, supra,* 398. If by this argument the defendant means to assert that the jury was permitted to find against the defendant upon the theory that it was negligent in failing to repair the gates the answer is to be found in the unqualified instruction subsequently given that "If the engineman did all that he could have done, or that the person of average prudence would have, to avoid the accident, then the defendant must prevail." Taking into account the charge as a whole, there is no "probability that the language may have conveyed to the jurors an erroneous conception of the law." *West* v. *Railroad,* 81 N. H. 522, 533. A fair reading of the charge shows that liability was to be found only in negligent operation of the train, and that the condition of the gates was to be considered only in connection with the train's operation, and then only if the defendant was chargeable with notice that they were out of order.

The questions raised by the denial of defendant's other requests have been examined and found to require no discussion.

*Judgments on the verdicts.*

All concurred.