Hillsborough, } No. 3032.
Jan. 3, 1939. }

Lucy Katsikas (*by her next friend*)

*v.*

Manchester Street Railway.

Anna Katsikas (*by her next friend*) *v.* Same.

Christos Katsikas *v.* Same.

Pearl Luczkewycz (*by her next friend*) *v.* Same.

Harry Luczkewycz *v.* Same.

*Sullivan & Sullivan (Mr. Thomas E. Dolan* orally), for Christos Katsikas, Lucy Katsikas and Anna Katsikas.

*Chretien & Craig,* for Harry Luczkewycz and Pearl Luczkewycz.

*Demond, Sulloway, Piper & Jones (Mr. Jones* orally), for the defendant.

MARBLE, J.   The accident occurred on the evening of November 20, 1932, between six and seven o'clock, on the highway leading from Goff's Falls toward Manchester.   The defendant's street car line at the scene of the accident comprised a double track situated east of the macadam or traveled part of the highway.   The three girls (hereinafter called the plaintiffs) were riding on an old draft horse and holding onto portions of his heavy work harness.   This horse, described by one of the witnesses as an old plug, was used by Christos Katsikas for work on his farm.

The plaintiffs, after harnessing the horse, started out from the Katsikas farm, which was situated near Goff's Falls, and rode north to call on a friend.   It was dark when they left the friend's house, and in order to avoid the traffic they decided to drive in the space between the two sets of tracks.   As they came round a curve they saw the headlight of an approaching street-car.   According to their testimony, Lucy, who was driving, pulled on the right rein, but the horse, instead of turning to the right, backed a few steps and was then struck by the car.   All three stated positively that the horse did not move at any time faster than a walk.   The car was running north from Goff's Falls; the plaintiffs were riding south.

The motorman testified that a car going 15 or 16 miles an hour on a straight and level track could be stopped in less than 60 feet; that as his car came to the guardrail of the curve that evening he saw a dark object 133 to 135 feet away; that his car was then going about 15 miles an hour; that the headlight did not light up the entire curve so that he could not tell what the dark object was, but that he put on his emergency brake at once and reversed the power, and that the car stopped in 53 feet.

He further testified that when the object was about 30 feet distant he saw it was a horse, running or galloping toward him, in the center of the east track, "with people on it, riding horseback"; that the horse kept on running in the middle of the track until within 8 or 10 feet of the front of the car when "he gave a side jump to the west" and hit the car after it had come to a stop. On cross-examination he admitted that it was "correct" to say that while his car was "going 53 feet, the horse traveled 80 feet."

There were two passengers on the car. One of them stated that the car "didn't decrease its speed any before the accident." The other testified that she saw a shadow on the side window and heard "an awfully loud crash." She said, "I never thought it was a horse; I thought it was a house, the way we hit them." She stated definitely that the car did not "come to a standstill before the accident" but was "going right along." Both passengers alighted and walked back to where the horse and the plaintiffs were lying. One estimated that distance to be 60 feet "in back of the car"; the other, the length of a car and a half.

On the evidence most favorable to the plaintiffs it could be found that the horse was walking all the time, that the motorman, after seeing the object 133 feet away, did nothing to check the speed of the car until the moment of collision, and that due care on his part after he discovered the object on the track would have prevented the accident. *Peppin* v. *Railroad*, 86 N. H. 395, 399, and cases cited.

Nor were the plaintiffs guilty of contributory negligence as a matter of law. They talked the matter over and agreed that "because there was lots of traffic coming" it would be safer to ride between the tracks. They knew, to be sure, that a car might come at any time, but they trusted to their ability to get out of its way. One of them testified: "We didn't know what time it was; we thought that would be the safest side, and if a car came we would go toward the west side; if it came down we would go toward the other side, and that is why we came in between the tracks." The fact that they had been told not to ride the horse except in the pasture was merely one circumstance to be considered on the issue of their care. Their ages and lack of experience were also to be considered. *Charbonneau* v. *MacRury*, 84 N. H. 501, 511; *Howe* v. *Company*, 87 N. H. 122, 126.

A witness, called by the defendant, testified that he took various photographs on the morning after the accident, that he then found hoofprints between the rails of the east track, and that these hoofprints led southward to within five to eight feet of the point where

the horse had apparently lain and then crossed the west rail in a westerly and southerly direction. Photographs supplementing the witness' description were introduced as exhibits.

The fact that the plaintiffs may have been riding between the rails just before the accident happened does not conclusively establish their fault. The jury may well have found on the evidence that if they were riding where the hoofprints indicated, they were riding there unwittingly. Ordinary care under the circumstances was all the care they were required to take for their own safety. It was so dark that they "couldn't see the rails" but they thought the horse was going "right along in a level path" between the east and west tracks. See *Daniels* v. *Lebanon*, 58 N. H. 284, 286; *Vidal* v. *Errol*, 86 N. H. 1, 15.

The jury were instructed without objection that if the plaintiffs knowingly placed the horse in a dangerous place and were injured by a danger to be reasonably anticipated in that place by them, they could not recover. The defendant suggests that this instruction became the law of the case (*Hill* v. *Carr*, 78 N. H. 458, 462) and contends that there is no evidence that would warrant a submission to the jury of the questions thereby raised.

The instruction is not to be taken from its context but must be read in connection with the somewhat extensive instructions relating to the degree of care required of minors. The word "dangerous" is relative and there is abundant evidence that the plaintiffs did not ride in a place which they considered unsafe. While they knew that cars ran between Manchester and Goff's Falls on a regular schedule, they did not expect that the horse could not be easily turned away from the tracks if a car should appear. It should be noted that the part of the instruction relating to anticipation has reference to what was to be reasonably anticipated "by them". Elsewhere in the charge the jurors were instructed that "minors are not expected to have the mature judgment of adults" and that the conduct of the plaintiffs should be compared with that of "average girls of their age, judgment, capacity, experience and ability, if similarly situated and acting under the same circumstances and conditions."

The motions for nonsuits and directed verdicts were correctly denied.

There was error, however, in the submission of the case to the jury under the doctrine of the last clear chance. Under this doctrine a plaintiff must show affirmatively that the defence of contributory fault is not available (*Clark* v. *Railroad*, 87 N. H. 434, 438); and in

order to recover, despite his own negligence, he is required to prove not only that he was ignorant of his peril, or unable to extricate himself therefrom, but that the defendant had actual knowledge of such ignorance or inability on his part and after such knowledge had a clear opportunity to avoid injuring him by the exercise of ordinary care (*Clark* v. *Railroad*, 87 N. H. 36, and cases cited).

No such situation is here disclosed. If the motorman told the truth he did all he could to avert the collision as soon as he saw the dark object on the track. On the other hand, if he did not see it until the moment of impact it is obvious that there was nothing he could then have done.

The plaintiffs are committed to their testimony that they were fully aware of the approaching car, that the horse was walking instead of galloping, and that when Lucy pulled the rein to turn him to the right, away from the east track, he backed unexpectedly, and the impact immediately followed. *Harlow* v. *Leclair*, 82 N. H. 506; *Sarkise* v. *Railroad*, 88 N. H. 178, 181.

In addition to the testimony already quoted we call attention to the following extracts from the record:

Testimony of Lucy Katsikas: "Q. Had he [the horse] gone any faster than a walk . . . up to the time the accident happened? A. No, sir. Q. What did you do when you saw the car coming toward you? A. I tried to sway the horse out of the way. Q. What happened? A. The horse took two steps backward, and I couldn't remember any more. Q. Which rein did you pull on when you saw the car coming? Q. On the right rein. Q. What happened to the horse? What did it do, when you pulled on the rein? A. He turned his head to the west. Q. Had you ever had any difficulty of any sort with that horse before? A. No, sir."

Testimony of Pearl Luczkewycz: "Q. You mean you never made him [the horse] go any faster? A. No; we couldn't if we wanted to, he was usually tired by night, he was working in the garden; and when we took him out of the pasture he was too tired, he couldn't go fast; he was an old work horse; you couldn't make him trot. Q. When you saw the car coming, did any of you try to get off the horse? What did you do? A. We told Lucy to jerk on the reins; I suppose if we wanted to we could have jumped off. Q. You didn't try to jump off? A. No; because we thought we could get out of between the tracks. Q. You mean, you thought the horse would go over and get out of the way? A. We didn't think an accident was going to happen; we thought a lot of the horse, and didn't want

him to get hit. Q. You didn't jump off? A. No; because we were seeing what Lucy would do, she was driving, and we thought we would be all right; and we thought a good deal of the horse, as I say. Q. You didn't try to get off? A. No, sir. Q. The horse backed up and went a few steps? A. Yes. Q. Do you remember what happened after that? A. That is all I remember."

Testimony of Anna Katsikas: "Q. Do you remember anything that was done to get the horse out of the car tracks? A. Lucy struck the right rein, pulled the right rein, but he only turned his head, and he might have taken a few steps backward, if he moved any. Q. You do not remember if he moved any, do you? A. No, sir; I don't. Q. Did the crash seem to come after Lucy pulled on the rein? A. A little after. Q. A long while after? A. It seemed pretty sudden to me."

If, then, the motorman saw the plaintiffs in the situation they describe early enough to have prevented the collision, there was nothing in that situation to warrant a finding that he believed that they were unconscious of their peril or unable to rein the horse to a place of safety. When the horse began to back, it was then too late to avoid the accident. Nor could a belief on the motorman's part that the plaintiffs could do nothing to escape injury be properly inferred from the mere fact that he deemed it expedient to stop the car. *Legere* v. *Company*, 89 N. H. 423.

The verdicts are set aside. It is therefore unnecessary to consider the other exceptions.

*New trial.*

BRANCH, J., was absent: the others concurred.